VÍCTOR JOSÉ MIRANDA, Plaintiff and Appellant, *v.*
VÍCTOR JOSÉ COSTA, Respondent and Appellee.

No. 10744. Argued January 26, 1953.—Decided December 30, 1954.

*Gustavo Cruzado Silva* for appellant. *McConnell & Valdés* for appellee.

JUDGMENT

The judgment rendered by the former District Court of San Juan on December 18, 1950, in above-entitled case, is affirmed.

It was so decreed and ordered by the Court as witness the signature of the Chief Justice. Mr. Justice Negrón Fernández dissents for the reasons set forth in his opinions in *Vargas* v. *Jusino*, 71 P.R.R. 362, 369, *Figueroa* v. *Díaz*, 75 P.R.R. 152, and *Armáiz* v. *Santamaría*, civil case No. 10,945, per curiam decision of December 30, 1953, [75 P.R.R. 544].

Mr. Justice Pérez Pimentel did not participate herein.

Mr. Justice Belaval dissented in a separate opinion.

A. CECIL SNYDER,
*Chief Justice.*

I attest:
IGNACIO RIVERA,
*Secretary.*

MR. JUSTICE BELAVAL, dissenting.

This is an action of filiation brought under the authority of Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296), as amended by Act No. 243 of May 12, 1945 (Sess. Laws, p. 415), wherein plaintiff-appellant alleges that he was born on March 4, 1932, of certain sexual relations had between his mother, Obdulia Miranda, and his putative father, Víctor José Costa; that although his alleged father has not acknowledged him legally, he has done so "by virtue of acts which constitute authentic evidence of his paternity." Since the putative father was a married man at the time of the alleged extramarital relations of which plaintiff-appellant was allegedly born, he prays to be declared the acknowledged natural child of his presumptive father for the sole purpose of bearing his surname.

The evidence which the trial court had under consideration may be summed up as follows: from June 1931 through

October of that year, plaintiff-appellant's mother had sexual relations with defendant-appellee, almost daily, in a house which he established for her on Del Río Street in the ward of Santurce; that in October 1931, when she told him that she was pregnant, defendant-appellee urged her "to procure an abortion," which she refused to do; that defendant-appellee did not thereafter go back to her and discontinued the extramarital relations with the mother; that on one occasion when the child, who was four years old, was taken sick, she sought defendant's help by telephone, and he sent her five dollars but warned her not to consider it as an obligation; that when the child was about to graduate from high school, the mother requested Samuel Castro Ponce to take the child to his presumptive father in order that he should acknowledge him; that Samuel Castro Ponce took the child to his alleged father and carried out the commitment entrusted to him of asking him to acknowledge the child; that defendant-appellee answered him in a sarcastic tone that he was sick, that he would not live long, and that the question of acknowledgment was in the hands of his attorney; that on that occasion defendant-appellee looked upon plaintiff with indifference and ignored him, which the minor resented greatly.

In view of the fact that the trial judge expressed doubts as to the sufficiency of the evidence offered by plaintiff-appellant, according to the prevailing doctrine at the time of the trial, it was not necessary for defendant-appellee to present his evidence. After examination of the evidence presented by the moving party, the trial judge rendered judgment declaring that the evidence was not sufficient to bring appellant's action within the purview of § 125 of the Civil Code of Puerto Rico, and, therefore, that the status of natural child of the defendant could not be conceded to him for the purpose of bearing his father's surname.

The grounds of the judgment were set forth as follows: the action is brought under the provisions of Act No. 229 of May 12, 1942, as amended by Act No. 243 of May 12, 1945, particularly § 2 thereof. Since the Act does not specify the cases in which an adulterine child, included among natural children by virtue of the amendment, born prior to May 12, 1942, may bring action of acknowledgment, the Supreme Court of Puerto Rico has held that he may exercise such action provided he is able to establish his filiation under the provisions of § 125 of the Civil Code of Puerto Rico bearing on natural children, subdivision 4 of which provides that the father is obliged to recognize the child "When the child may present any *authentic evidence* of his paternity." Although the Civil Code of Puerto Rico does not say what kind of evidence shall be regarded as "authentic evidence," the Supreme Court of Puerto Rico has held "that the said authentic evidence must be such as may be considered equal to that of an indubitable statement in writing of express acknowledgment, uninterrupted possession of the status of natural child and concubinage of the mother with the father during the pregnancy or at the time of the birth of the child." An analysis of the evidence reveals that it is not sufficient to establish a state of concubinage-marriage without being so; neither does it reveal that plaintiff was in uninterrupted possession of the status of a natural child. And a further conclusion seems to be, although it is not expressly stated in the conclusions of the judgment, that the evidence is not sufficient to establish the adulterine child's paternity.

Feeling aggrieved by the recitals of the adverse judgment, plaintiff-appellant appealed to this Court assigning as only error the following: "The lower court erred in holding that, under the second paragraph of § 2 of Act No. 229 of May 12, 1942, as amended by Act No. 243 of May 12, 1945, plaintiff did not establish his case in the light of subdivision

4 of § 125 of the Civil Code, and in holding that plaintiff's evidence was not even *prima facie* sufficient to establish his case."

In 1902, by virtue of § 189 of the Revised Civil Code then in force, the father was obliged to recognize his illegitimate child: "1. Where there be an authentic statement in writing made by him expressly recognizing its paternity. 2. When publicly or privately he has shown that it is his child, or has called it as such in conversation, or looks after its education and maintenance. 3. When the mother was known to have lived in concubinage with the father during the pregnancy or birth of the child, or when the child was born while his parents were engaged to be married (*relaciones amorosas*) [maintained amorous relations]."

From a close analysis of the content of this section, it is not difficult to find a poorly compensated and still worse systematized combination of § 135 of the Spanish Civil Code of 1889, which provided: "The father is obliged to acknowledge the natural child: When an indisputable paper written by him, expressly acknowledging his paternity, is in existence," or "When the child is in uninterrupted enjoyment of the status of a natural child of the defendant father, justified by the direct acts of the same father or of his family"; and of §§ 208 and 209 of the Civil Code of Louisiana of 1825, which provide: "Illegitimate children, who have not been legally acknowledged, may be allowed to prove their paternal descent." (Section 208.) "In the case where the proof of paternal descent is authorized by the preceding article, the proof may be made in either of the following ways: 1. By all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so; 2. When the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such; 3. When the mother of the child was known as living in a

state of concubinage with the father, and resided as such in his house at the time when the child was conceived." (Section 209.) See Spanish Civil Code related to the laws in force and annotated by Dionisio Doblado (ed. by Librería de la Viuda de Hernando & Compañía, 1889), and Revised Civil Code of Louisiana with amendments, including the Session of the Legislature of 1908, by E. D. Saunders (ed. by F. F. Hansell & Brother, Ltd., 1909.)

With the exception of the first subdivision—"Where there be an authentic statement in writing made by him expressly recognizing its paternity" —which was taken from the Spanish Code, the remaining subdivisions are taken from the Civil Code of Louisiana, except for the last provision, which authorizes the acknowledgment when the child was born "while his parents were engaged to be married (*relaciones amorosas*) [maintained amorous relations]," which seems to be the purely Puerto Rican contribution to the framing of said § 189.

It will be seen that in 1902, when § 189, which is the genesis of our present § 125, was in force, there were available in Puerto Rico to illegitimate children, still defined as "born out of wedlock," the following possibilities of acknowledgment: (1) the authentic statement; (2) when publicly or privately the father has shown that it is his child; (3) when he has called it as such in conversation; (4) when the father looks after its education or maintenance; (5) when the mother was known to have lived in concubinage with the father during the pregnancy; (6) when the mother was known to have lived in concubinage with the father during the birth of the child; (7) when the child was born while his parents were engaged to be married (*relaciones amorosas*) [maintained amorous relations].

The legislative history of the reform undergone by the provisions of our Civil Code bearing on natural children, is curious. Bill No. 209 of the House of Delegates, which

finally became Act No. 73 of March 9, 1911, and, in part, § 193 of the 1911 edition of our Code, which became § 125 of the 1930 edition, which is still in force, was originally introduced in the House of Delegates as follows:

"Section 193.—Natural children are those born out of wedlock from parents who, at the moment when such children were conceived, could have intermarried with or without dispensation.

"The natural child may be recognized by the father or the mother conjointly or by one of them only either in the record of birth or in the testament or in any other public instrument.

"The father is obliged to recognize the natural child:

"1. When there exists an indubitable statement in writing of the father wherein he expressly acknowledges his paternity.

"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family.

"The mother shall likewise be obligated to recognize a natural child in the same cases as the father, and further where the act of the confinement and the identity of the child are fully established.

"*When the acknowledgment is made separately by the father or the mother, the name of the child's other parent shall not be revealed by the parent acknowledging it, nor shall any circumstances be mentioned by which such person might be recognized.*

"The child, if of age, cannot be recognized without his consent.

"When the recognition of the minor is not made at the time of recording the birth or in the testament, the approval of the judge of the district court of the district where the child resides, with the concurrence of the fiscal, shall be necessary."

As has been seen, the intent of our House of Delegates was to reincorporate in our civil institutions, almost literally, the provisions of §§ 119, 129, 131, 135, 136, 132, and 133 of the Spanish Civil Code of 1889. We have presented the

concordance of the sections in the order in which they were incorporated in Bill No. 209.

After the said Bill was passed by the House of Delegates of Puerto Rico, it was referred for approval to the Executive Council of Puerto Rico, which at that time discharged functions similar to those of a senate. The Executive Council returned it with amendments, to wit:

"Sec. 193.—Natural children are those born out of wedlock from parents who, at the moment when such children were conceived, could have intermarried with or without dispensation.

"The natural child may be recognized by the father or mother conjointly or by one of them only either in the record of the birth or in the testament or in any other public instrument.

"The father is obliged to recognize the natural child:

"1. When there exists an indubitable statement in writing of the father wherein he expressly acknowledges his paternity.

"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family.

"3. When the mother was known to have lived in concubinage with the father during the pregnancy and at the time of the birth of the child, *as well as where the mother, having had other children by the father, was abandoned by the father while she was carrying the child whose legitimation is sought.*

"4. When the child may present any authentic evidence *of his status as a natural child.*

"The mother shall be obliged to recognize a natural child in the same cases as the father, and further where the act of the confinement and the identity of the child are fully established.

"The child, if of age, cannot be recognized without his consent.

"When the recognition of the minor is not made at the time of recording the birth or in the testament, the approval of the judge of the district court of the district where the child resides, with the concurrence of the fiscal, shall be necessary."

It will be seen that the Executive Council was not satisfied with the complete reversion to the Spanish theory on birthright, nor with the prohibition to investigate the pater-

nity or maternity when only one of the parties makes the acknowledgment, contained in the original bill introduced by Delegate José de Diego in the House of Delegates of Puerto Rico, and when the amended bill was passed it reincorporated the previous provisions on concubinage of § 209 of the Civil Code of Louisiana and the provisions on illicit relations of the Code of 1902. On motion of Delegate Herminio Díaz Navarro, the House of Delegates of Puerto Rico rejected the amendments and requested a conference, speaker José de Diego for the House of Delegates and Martín Travieso, Jr. for the Executive Council being designated conferees.

The Conference Committee submitted in writing the following report: "Your Conference Committee to which you referred the matter of the differences arising between both houses with respect to House Bill 209, has the honor to report that it has reached an agreement on the bill passed by the Executive Council, with the exception of the amendment made by the Executive Council, which shall read as follows: '3. When the mother was known to have lived in concubinage with the father during the pregnancy and at the time of the birth of the child.' Respectfully (Sgd) José de Diego, Conferee for the House. (Sgd.) Martín Travieso, Jr., Conferee for the Council."

It is always a difficult task to determine the legislative intent by an isolated interpretation of a few documents. We have examined closely the minute book of the House of Delegates of the First Session of the Sixth Legislative Assembly of Puerto Rico of 1911, the record of House Bill 209 of the First Session of the Sixth Legislative Assembly of 1911, and the corresponding certificates issued by our former Office of the Executive Secretary, now Department of State, for the promulgation of the Act, and, except for a description of some slightly annotated parliamentary routine, the only available data to make a critical review of its background are the three documents referred to above.

We shall begin by showing the indubitable elements of interpretation. There is no question that the original bill of the House of Delegates purported to restore almost entirely the Spanish civil-law institution contained in the 1889 Code, while the Executive Council purported to preserve almost entirely the American doctrine embodied in the Civil Code of Louisiana of 1825. There is no question that the purpose which prevailed in the instant case was that of the Executive Council and not that of the House of Delegates. There is no question that, as respects subdivision 1, the Spanish theory of the recognition by the father "when an indisputable paper written by him, expressly acknowledging his paternity, is in existence" prevails over the theory of the Civil Code of Louisiana which permits recognition "by all kinds of private writings in which the father may have acknowledged the bastard as his child, or may have called him so." There is no question that, as respects subdivision 2, the Spanish theory of the 1889 Code which prescribes the obligation of the father to recognize "when the child is in uninterrupted enjoyment of the status of a natural child of the defendant father, justified by the acts of the same father or of his family" (the Spanish Civil Code requires "*direct* acts of the same father," while our Code only requires "acts of the same father"), prevailed over the theory of the Civil Code of Louisiana which prescribes such obligation "when the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such." There is no question that, as respects subdivision 3, which, by the way, is the only subdivision which was amended by elimination of part of the text, which prescribes the obligation of the father to recognize "when the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child," is a quasi literal reproduction of subdivision 3 of § 209 of the Civil Code of Louisiana, which

prescribes the obligation of the father to recognize "when the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time when the child was conceived." There is no question that the former provision of § 189 of our Code of 1902, which provided the obligation of the father to recognize the illegitimate child "when the child was born while his parents were engaged to be married (*relaciones amorosas*) [maintained amorous relations]," becomes subdivision 4 of the bill approved in conference, prescribing the obligation to recognize "when the child may present any *authentic evidence of his status as a natural child.*"

It is well to make a brief digression in connection with the change undergone by subdivision 4. Both in the original bill proposed by the Executive Council and in the bill endorsed by the Conference Committee, as well as in the certificate issued by José Muñoz Rivera, Secretary of the House of Delegates, on the final form in which Bill 209 was passed by the House of Delegates and the Executive Council, subdivision 4 read as follows: "When the child may present any authentic evidence of his status as a natural child." However, it appears from the minutes of the Executive Council that the final draft of subdivision 4 was prepared by the House of Delegates and accepted by the Executive Council, as we shall presently see. Offhand it appears to be a mere correction of style, or the case foreseen by Seignobos in his famous method, in which he advises that "a great majority of the affirmations contained in a document are secondhand, if not third."

There is no question likewise that House Bill 209 represents a reconciliation among the provisions, some in open conflict, of § § 119, 129, 131, 135, 132, and 133 of the Spanish Civil Code and § § 208 and 209 of the Civil Code of Louisiana, and § 189 of the Civil Code of Puerto Rico of 1902. There is no question, on the other hand, that while

the Spanish Civil Code of 1889 permits the acknowledgment of a natural child in two cases—(1) indisputable paper, and (2) uninterrupted possession of the status of a natural child—the Civil Code of Louisiana of 1825 permits acknowledgment in five instances, to wit: (1) indisputable paper, (2) public verbal acknowledgment by the father of the child's filial status, (3) private verbal acknowledgment by the father of such status, (4) implied acknowledgment by the education of the child as such, (5) conception of the child during concubinage; and § 189 of the Civil Code of Puerto Rico of 1902 permits it in seven instances, to wit: (1) indisputable paper, (2) public verbal acknowledgment by the father of the child's filial status, (3) private verbal acknowledgment by the father of the child's filial status, (4) implied acknowledgment by the education and maintenance of the child as such, (5) concubinage during pregnancy, (6) concubinage during the birth of the child, and (7) engagement when the child was born (*relaciones amorosas*) [amorous relations].

In order to ascertain the possible evolution of House Bill 209, we cannot put aside the historico-juridical picture which the lawmaker had before him in 1911. The *reason* which the 1911 lawmaker had in mind in establishing the reform, which in the institution of naturality is expressed by §193 of our 1911 Code, was, we must admit, to reconcile more systematically and comprehensibly the conflicting provisions of § 189 of the former Code of 1902. The elements of *spirit* present in the discrepancy between our House of Delegates, zealous guardian of a historical patrimony threatened by a new political order, and our Executive Council, promoter of a politico-juridical annexationism to the new metropolis, are so clear and definite that the motive of reconciliation of tendencies is evident throughout the text.

However, the legislative intention keeps always a close relation to the sociological cause of the medium in which it

is produced. The social problem involved was so intricate that the law was justified in seeking shelter in its peculiar system of abstractions. The classical concubinage of aristocratic society, where the differences in lineage, class, and even that peculiar economy which constitutes in itself the dowry system obstructing normal marriage, upon becoming a part of the new American system, was transformed into other classes of illicit sexual relations of which the lawmaker was bound to take notice.

The illicit sexual relations of Spanish society, chiefly considered by the Spanish historical law as "damnable and punishable copulation," were (1) the bawdyhouse, (2) concubinage, and, as the rule of exception, the nefarious, the incestuous, and the sacrilegious. The other recognized illicit sexual relations are those procured by violence, such as violence, rape, or ravishment, which create a certain state of law following the corresponding judicial declaration. It does not recognize that sort of intermediate sexual institution which in Puerto Rico is known as a "mistress", the woman with whom *amorous relations* are had, as a rule under the promise of marriage.

The Puerto Rican "mistress" is not a whore (streetwalker) nor a concubine (paramour) but rather an amusement for purposes of illicit amorous relations, generally extramarital, who does not live with the man under the same roof, is not entirely supported by him, except for some help usually in the form of gifts, but who is known to have only one sexual union for some time, from which the maternal risk may be reasonably presumed. It started in the beginning as a sexual union between a man of a certain social position (*señorito*) and a common woman (*barragana*). As a result of the diversity of extramarital sexual relations created by the outside working opportunities for women after World War I, the position of the mistress has risen from a humble "common woman" to a woman of equal social and

spiritual standing as the man, within the system of classes established by the bourgeois society.

Section 189 of the Code of 1902 had by then established the father's obligation to acknowledge the illegitimate child born "while his parents were engaged to be married (*relaciones amorosas*) [maintained amorous relations]," which has no precedent either in the Spanish Civil Code of 1889 or in the Civil Code of Louisiana of 1825. Thus, after 1902 our civil legislation felt the need for recognizing among illicit sexual relations, in addition to concubinage, *the amorous relations at the time of the child's birth*, as a probability of paterno-filial responsibility.

However, a man may have amorous relations, at the time of birth, with a woman who is pregnant by another man. As a matter of sociological experience in this type of illicit amorous relations, the time when the man always abandons the woman is when the woman becomes pregnant. Our social service statistics confirm this type of conduct to satiety. It is the moment when the woman's maternal instinct must face the social selfishness of a man who does not want to have illegitimate issue. Almost always the abandoned woman must seek shelter in another illicit love, generally concubinal, with a man of social or economic standing inferior to that of the first man, in order to save the fruit of her womb. The cases in which the second man is willing to acknowledge as his the child of his concubine's first illicit sexual relation are not infrequent.

Undoubtedly, this is the sociological fact which prompted the conscience of the lawmaker to change in 1911 the dubious contents of the 1902 provision, which makes the filiation dependent on the moment of the birth, to the classical provision of the Spanish Civil Law, which makes the filiation dependent on the moment of conception. Hence, all the circumstances which might arouse suspicion as to the natural legitimacy were thus satisfactorily decided.

However, why change the concept "authentic evidence of his status as a natural child," originally proposed by the Executive Council and accepted in conference by the House of Delegates, to that of "authentic evidence of his paternity" in subdivision 4? We know from the Journal of the Executive Council of Puerto Rico, Legislative Session of 1911, that it was the last amendment proposed by the House of Delegates and accepted by the Executive Council after the conference. There is no question that the concept "paternal descent" (§ 208 of the Civil Code of Louisiana), embodied in the subconscious elements of the wording, had weight in the mind of the lawmaker. But something very important for a study of this institution has also happened.

It will be recalled that a provision was incorporated in the original bill proposed by José de Diego and approved by the House of Delegates, which read as follows: "When the acknowledgment is made separately by the father or the mother, the name of the child's other parent shall not be revealed by the parent acknowledging it, nor shall any circumstance be mentioned by which such person might be recognized," which provision is identical with that contained in § 132 of the Spanish Civil Code of 1889, a characteristic of those codes which, like the Spanish Code, do not permit the investigation of the paternity except in an indirect manner, namely, as a judicial declaration of a previous acknowledgment voluntarily made by the father, evidenced by his own direct acts or those of his family. This provision was expressly deleted by the Executive Council from the original bill of the House of Delegates. Evidently, the purpose until the last minute was that it should remain in the text, for in the last report submitted by the House of Delegates to the Executive Council requesting the latter's concurrence, after the report of the Conference Committee was submitted, which was partially transcribed in the minutes of the last session of the Council, the only two references appear-

ing from the final drafting of House Bill 209 are to the effect of showing that the House of Delegates consented to eliminate the provision, "When the acknowledgment is made separately by the father or the mother, the name of the child's other parent shall not be revealed by the parent acknowledging it, nor shall any circumstance be mentioned by which such person might be recognized," and to request the new wording of subdivision 4, "When the child may present any authentic evidence of his *paternity*," which explains the new text since, after crossing the traditional barrier of the prohibition to investigate the paternity contained in the Spanish Civil Code of 1889, the field was open to *any judicial investigation of the paternity*, which was the true spirit of the Civil Code of Louisiana of 1825, it being known that among the countries which adopted the system of investigating the paternity in certain cases are *Louisiana* and Portugal. 1 Manresa 634 (ed. by Instituto Editorial Reus, 1943.) This is an event of extraordinary significance of which our patrimonial jurisprudence does not seem to have been fully aware and which could have changed the entire philosophy of its interpretation as respects the last two subdivisions, inasmuch as Puerto Rico has been since 1911 among the countries where paternity can be investigated.

Conclusion: that subdivision 4 of the old § 193 of the Civil Code of Puerto Rico (1911 ed.), now § 125 of the Civil Code of Puerto Rico (1930 ed.), which is still in force, was designed to make the acknowledgment compulsory whenever the inference of the paternity is drawn from any illicit sexual relations between the natural father and the mother, at present also between the adulterine father and mother, which could not be regarded as concubinage. The only limitation imposed by subdivision 4 is that the evidence of illicit sexual relations be sufficient to clearly establish the fact of the paternity.

A possibility has been suggested that the words "any authentic evidence" refer exclusively to documentary evidence. Therefore, the problem is to determine whether the words "any authentic evidence" in subdivision 4 of § 125, which reads, "when the child may present any authentic evidence of paternity," are employed as a juridical acceptation sanctioned by usage in the science of law or as a term comprised within the grammatical wording, or as a mere proposition within logic for an outright reasoning.

It is well to point out that when § 125 speaks of the documentary form of the evidence of acknowledgment, it employs the phrases "public instrument" (second paragraph) and "indubitable statement" (private instrument), (subdivision 1), both acceptions having been taken from .the Spanish civil law.

In his commentaries on § 135 of the Spanish Civil Code, the only two subdivisions of which are identical with the first two of our § 125, Manresa says that "the public instrument is included in the indubitable statement." 1 Manresa 632 (6th ed. by Instituto Editorial Reus, 1943.) Commenting also on the manner of acknowledging a natural child, at p. 622 of the same textbook, Manresa says that, according to § 131 of the Spanish Civil Code, which is also a part of our § 125, the phrase "public instrument" comprises all instruments included in § 595 of the Spanish Law of Civil Procedure, to wit: (1) public instruments drafted according to law; (2) . . . ; (3) documents issued by public officials who are authorized to issue the same in the exercise of their official duties; (4) record books . . . registers, . . . and other documents in public archives or depending on the State, provinces, or towns, and copies made and authenticated by the secretaries and archivists, by order of the proper authorities; (5) . . . ; (6) records of certificates of births, marriages, and deaths taken from the registries by the parish priests, or by the persons in charge of the civil registers; (7) writs of execution and all kinds of judicial proceedings.

According to the Spanish commentaries, which are the most scientifically correct for the interpretation of the first two subdivisions of our § 125, which are taken literally from § 135 of the Spanish Civil Code, if the father is required to acknowledge a natural child under subdivision 1 of our § 125, namely, "when there exists an *indubitable statement in writing of the father* wherein he expressly acknowledges his paternity," there may be presented any private instrument (indubitable statement) or any public instrument to establish the acknowledgment.

"Evidence" is a generic term which includes instrumental or documentary evidence as well as any other kind of evidence. The Spanish legal technology has defined evidence as that which ascertains in a judicial proceeding a doubtful fact, or the means by which the truth or falsity of any alleged fact is expressed and made evident, there being two kinds of evidence—full and semi-full. According to Escriche's *Diccionario de Legislación y Jurisprudencia*, Vol. 4, p. 755 (ed. by Imprenta de Eduardo Cuesta, 1876), full evidence, also known as complete or perfect, is that which leaves no doubt as to the truth of a fact in issue; and semi-full evidence, also known as incomplete or imperfect, is that which by itself does not clearly establish the fact in issue. Full evidence is: (1) the confession by a party at a trial, (2) *the testimony of two or more agreed witnesses*, (3) deeds or other public instruments, (4) the evidence or personal inspection by the judge. Semi-full evidence is: (1) the testimony of a single witness, (2) extra-judicial confession, (3) identity of handwriting (in a private instrument), (4) public reputation by itself without the support of competent witnesses, (5) supplemental oath, and (6) presumptions.

According to the *Enciclopedia Jurídica Española*, Vol. 26, p. 395 (ed. by Francisco Seix, 1910), "evidence" is the satisfactory demonstration of an affirmation, the reality of which

does not stand alone. The means of evidence (p. 396) are four: (1) confession by the adversary, known as verbal evidence; (2) the production of witnesses, known as oral evidence; (3) title evidence, known as documentary evidence; and (4) the presumptions, known as conjectural evidence.

However, we have been unable to find in the Spanish legal terminology the expression "authentic evidence." We have found "authentic copy," "authentic person," "authentic penalty," "authentic of the institutions," "authentic of the Code," "authentic of the novels," "authentic *si qua mulier*"—3 *Enciclopedia Jurídica Española* 823, 824 (ed. by Francisco Seix, 1910); "authentic act," "authentic instrument," "authentic title" —1 *Diccionario de Derecho Privado* 560 (ed. by Editorial Labor, S. A., 1950). Authentic also applies to "an honest fellow who is elevated to the rank of count, duke, or marquis *deserving credit.*" 1 Escriche's *Diccionario Razonado de Legislación y Jurisprudencia* 878 (ed. by Carlos Bailly-Bailliere, 1874). "The term *authentic person* is employed in Law 1, Tit. XVIII of Partida Third; Gregorio López' edition does not agree with the official edition of the *Academia de la Historia.* According to Gregorio López' edition, an authentic person is one of high dignity, and, according to the *Academia*, every trustworthy person." *Enciclopedia Jurídica Española*, vol. cit., p. 823.

Since the last two subdivisions of our § 125 were taken from the Civil Code of Louisiana, it is only fair to investigate whether the phrase "authentic evidence" exists in American legal terminology as a phrase sanctioned by legal usage. Subdivision 4 of our § 125— "Cuando el hijo pueda presentar cualquier *prueba auténtica* de su paternidad"— was translated in the contemporary English version of 1911 as "When the child may present any *authentic evidence* of his paternity." We will begin by saying that the terms "proof" and "evidence" are used interchangeably.

"Proof," in American legal terminology, is also a generic term which includes any factual event or circumstance which leads the mind of a judge to the truth of a proposition advanced; the logically sufficient reason for assenting to the truth of a proposition advanced; in its strict juridical sense it comprehends everything that may be adduced at a trial, within the legal rules governing admissibility, for the purpose of producing a certain degree of reasonable conviction, that is, everything that has a probative force intrinsically and not merely as a deduction from probative facts. "Evidence" is a more specific and narrower term, and includes only such kinds of proof as may be legally presented at a trial, by the act of the parties, and through the witnesses, records, or other documents. "Proof," in a strictly accurate and technical sense, is the result or effect of *evidence* admitted, while "evidence" is the medium or means by which a fact is proved. Proof is the conclusion drawn from the evidence. "*Proof*, when used in a legislative enactment, means competent and legal evidence, testimony conforming to fundamental rules of proof, excluding hearsay evidence, however trustworthy." Henry Campbell Black's *Law Dictionary*, p. 1380 (4th ed. by West Publishing Co., 1951); *Law Dictionary* with Pronunciations, James A. Ballentine, p. 1032 (ed. by Lawyers Co-operative Publishing Co., 1948.)

Nor have we been able to find in American legal terminology, not even in the exhaustive system of contraindications contained in American dictionaries of forensic terminology, the phrase "authentic proof" or "authentic evidence" as having its own meaning, sanctioned by judicial usage. We have found as a term of relation "authentic act," "authentics," "authentic interpretation of law." As a matter of fact, when the term of relation is used in connection with documents or writings, we say: "authenticated copy of patent," "authenticated copy of records of judgments," "authenticated report." 4 *Words and Phrases* 825 *et seq.*,

1954 Supp. 156. In Black's *Law Dictionary*, *supra,*. p. 168, the word "authentic" has the following acceptations: "(1) genuine, (2) true, (3) real, (4) pure, (5) reliable,. (6) trustworthy, (7) having the character and authority of an original, (8) duly vested with all necessary formalities and legally attested, (9) competent, (10) *credible*, (11) *reliable as evidence*." Thus, it is not the case within the peculiar situation of Puerto Rico, where the use of two languages and the interaction of two legal systems have created a certain corruption in the traditional juridical concepts.

Since we have been unable to find in Spanish forensic terminology, which is so accurate in defining correctly the juridical concepts, or in the American forensic terminology, which is somewhat more arbitrary, as is to be expected of a law which is in process of national formation but always alert to the judicial evolution of its juridical concepts, the phrase "authentic evidence" as a terminological individualization sanctioned by legal usage, we can disregard the rule of construction contained in § 16 of our Civil Code to the effect that "Technical terms and phrases used in the arts. and sciences shall be interpreted according to their received meaning and acceptation with the experts and authorities in the science, art or profession to which they refer."

Should we conclude that the words "any authentic evidence," used in subdivision 4, are equivalent to "any *authentic instrument*" or "*any public instrument,*" we would be faced with a case of duplication of provisions within the same § 125, according to the logical rule of identity, since the second paragraph of that section, when referring to the voluntary recognition by the father, states that the recognition in the record of birth or in any other *public instrument* is sufficient. If we reached the conclusion that the words. "any authentic evidence," used in subdivision 4, are equivalent to "any indubitable statement in writing wherein the

acknowledgment is not expressly made," we would be faced with a case of inconsistency, according to the logical rule of contradiction, for if the recognition is not expressly made, the statement should never be as sufficient alone to establish the recognition, as the statement in writing which is express and also indubitable. This being so, evidence of some other kind should be necessary to connect said writing with the fact of the paternity, in which case there is no reason for limiting the action of filiation provided in subdivision 4 to a simple instrument. It is thus commented by Manresa when referring to the specific point of the character of expressiveness of the indubitable instrument: "However, the courts shall decide in each case, *and whenever the document does not by itself* recognize the paternity in a sufficiently expressive manner, such document, coupled with other data, shall serve to establish the uninterrupted possession of the child's status for the purposes of this section and subdivision 2 thereof." 1 Manresa 636, 637, same edition. Therefore, there is no question that acknowledgment by the father shall be compulsory: (1) whenever there exists an indubitable statement in writing of the father wherein he expressly acknowledges his *paternity*, and (2) when the child may present any evidence of his *paternity*. The important thing is that the fact of the *paternity*, namely, *the illicit relation at the time of conception* and not of the birth, be judicially established by a statement in writing or by any reliable evidence.

We are therefore faced with one of those cases where the common and general usage of a word within a norm may be confounded with a possible acceptation of a juridical character, but which, after a proper terminological analysis, is reduced to its habitual signification as a term of common parlance. According to § 15 of our Civil Code, "The words of a law shall generally be understood in their most usual signification, taking into consideration, not so much the exact

grammatical rules governing the same, as their general and popular use." In Puerto Rico, the use of the word "authentic" is common as meaning legitimate, genuine, true, such as "the authentic roots of our culture," "the authentic personality of the Puerto Rican," "it is the authentic feeling of this majority," "authentic demonstration of his creative powers," "the authentic religious spirit of our countryman." In his well-known treatise on *Derecho Civil Español, Común y Foral* (ed. by Instituto Editorial Reus, 1949), Castán states in Vol. 1, pp. 776 and 777, that "the general uses of the language must always be borne in mind in the interpretation of the law, since the rule is addressed to the generality, to all the subjects, while the interpretation of juridical business may at times be founded on the individual uses."

There is an interpretation made by our own Court which is quite contemporaneous with the legislative adoption of the new subdivision 4 (1911–14), wherein the learned Chief Justice Hernández states as follows: ". . . Not only are the first three cases of section 193, as amended by section 1 of Act No. 73 of March 9, 1911, not applicable, but also the fourth case is not, for no authentic evidence of the paternity of . . . was presented. *The said section does not define what authentic evidence is referred to*, but we can well deduce from the spirit of the act tending to require *more convincing proof of filiation* than was required formerly by section 189, and by the principle *noscitur a sociis, that the said authentic evidence must be such as may be considered equal* to that of an authentic written statement of express acknowledgment, continuous possession of the status of natural child and concubinage of the mother with the father during her pregnancy and at the time of the birth of the child," that is, all kinds of evidence, but within the degree of credibility traditionally known as "strong and convincing." (Italics ours.) *Méndez v. Martínez*, 21 P.R.R. 238,

256.   The same criterion is expressed by the trial judge in the case at bar.

However, at the time of passing judgment the trial judge did not have the benefit of an ample discussion of the "strong and convincing evidence" rule announced in our decision in *Figueroa* v. *Díaz*, 75 P.R.R. 152, 163, 173, 178, 179, 180, 181, 185 (Negrón Fernández, Ortiz, Marrero, Sifre) (1953), in which it was held that, "There is nothing in the act requiring a specific 'quantum' or type of evidence to justify the compliance with said requirements," and therefore, filiation suits must be decided in accordance "with the authentic preponderance of the evidence" The need for the new rule was evident.   In enacting § § 189 of the Code of 1902, 193 of the Code of 1911, and 125 of the Code of 1930, the lawmaker had in mind an illicit sexual relation between an unmarried male and an unmarried female, where greater inquiry into paternity is possible.   In enacting Act No. 229 of May 12, 1942 and Act No. 243 of May 12, 1945, the lawmaker had in mind an illicit sexual relation between a married male and an unmarried female, or a married female and an unmarried male, or a married male and a female married to another man, who were nót intermarried. While in the case of natural descent of unmarried male and female the indubitable statement in writing may be express, open, and deliberate, since there is no conflict with any other legitimate descent, in the case of an adulterine descent of a married male or female the indubitable statement may be less precise, more cautious, more contradictory.   While in the case of natural descent of an unmarried male and female the possession of the status of a natural child may be un-interrupted and public, since there is no conflict with any other marital status, in the case of adulterine descent of a married male or female the possession of the status of a natural child may be interrupted, less public, more circumstantial.   While in the case of natural descent of an un-

married male and female the state of concubinage may be public and evident, since there is no conflict with the legitimate conjugal relations, in the case of adulterine descent of a married male or female the state of concubinage may be surrounded by greater secrecy and prudence. While in the case of natural descent of a single male and female the sexual relation from which paternity may be inferred may be manifest and spontaneous, since there is no conflict with a family's social interest, in the case of adulterine descent of a married male or female the sexual relation from which the paternity may be inferred may be surrounded by an atmosphere of moral secrecy and mortification. For this reason, the previous jurisprudence of this Court on § 125 up to 1942, which dealt with the acknowledgment of natural children of unmarried parents was without basis for strict application in connection with everything concerning the acknowledgment of adulterine children of a married male or female. Hence, two members of this Court, Mr. Justice Negrón Fernández and the writer, have maintained the criterion that inquiry into adulterine paternity must not be made within the scope of the traditional naturality provided in § 125 for unmarried males and females, but within a generic civil action wherein the sexual relations at the time of conception are the essential fact for the purpose of establishing the paternity.

It is well to state also, as an analogous parenthesis, that when Art. 43, fourth paragraph, of the Constitution of the Spanish Republic of December 9, 1931, was adopted, which declared that "The civil laws shall regulate the investigation of the paternity," although that was a "merely programmatic precept" which "was not carried out because no law was enacted on that matter" —1 Manresa 635, footnote 2, ed. cit.— the Supreme Court of Spain declared, by the simple constitutional rule, "that the *merely declarative interpretation* and *not the restrictive interpretation* preconized by the traditional jurisprudence, should be given to § 135, to the

same extent and no less than to those sections which regulate the investigation of the paternity of non-natural illegitimate children, bearing in mind the underlying spirit of Art. 43 of the Constitution of the Republic as an interpretative element." 1 Manresa 638, footnote 1, ed. cit. The reason is too obvious to deserve an exhaustive comment. The constitution is always a general norm imposed "by the powerful hand of all the peoples," who exalt the inviolable principle for the entire life of a country. It is the only eternal interpretation of a juridical reality.

In the case of Puerto Rico, we should consider: first, the legislative rule laid down in Act No. 73 of March 9, 1911, where, following a principle similar to that of the Civil Code of Louisiana, inquiry into the paternity was permitted, notwithstanding the reluctance of our earlier jurisprudence to recognize a legislative fact full of human significance for the future; second, the legislative rules contained in Act No. 229 of May 12, 1942 and Act No. 243 of May 12, 1945, extending the recognition to adulterine children (bastards); third, the constitutional rule contained in § 1, Art. II of the Constitution of the Commonwealth of Puerto Rico of July 25, 1952, which reads: "The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, *birth*, social origin or condition, or political or religious ideas;" fourth, the legislative rule contained in Act No. 17 of August 20, 1952, which declares: "All children have, with respect to their parents and to the estate left by the latter, the same rights that correspond to legitimate children" as of July 25, 1952. Irrespective of the different rights granted by the divers laws to children born prior to July 25, 1952, there is a normative aspect of interpretation, of new attitude, of new mentality, which should be reflected on the entire legal institution of natural and adulterine acknowledgment.

There is no question that the evidence which the trial court had under consideration is sufficient, within the theory

of preponderance of the evidence which we have adopted, for the sole purpose of bearing the putative father's name, to establish the fact of the sexual relations at the time of conception, from which the paternity may be inferred.

In line with the rule adopted by the majority of this Court in the sense that such acknowledgment may be established within the different requirements of proof authorized by § 125 of the Civil Code of Puerto Rico, such evidence is also sufficient to establish a filial status under subdivision 4 of said § 125.

In view of the foregoing reasons, I am compelled to dissent.